Shawn A. McMillan, Esq. – SBN: 208529
attyshawn@netscape.net
Stephen D. Daner, Esq. – SBN: 259689
steve.mcmillanlaw@gmail.com
Adrian M. Paris, Esq. – SBN: 301355
adrian.mcmillanlaw@gmail.com
THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
4955 Via Lapiz
San Diego, California 92122
Phone: (858) 646-0069
Fax: (858) 746-5283

Attorneys for Plaintiffs,
Ricardo Bruno and Rachel Bruno

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| RICARDO BRUNO, an individual; RACHEL BRUNO, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF LOS ANGELES, a public entity; COUNTY OF ORANGE, a public entity; CHOC CHILDREN'S HOSPITAL OF ORANGE COUNTY, a private corporation; DEPUTY JASON SCHMOKER, an individual; DETECTIVE MARICRUZ PEREZ, an individual; DETECTIVE BELEN LEMUS, an individual; DEPUTY J. LEE, an individual; LAURA TODD, an individual; NICOLE STRATTMAN, an individual; SOCIAL WORKER DOE 1, an individual; NURSE DOE 1, an individual; DOCTOR DOES 1 through 2, as individuals; DOES 1 through 10, inclusive, <br><br> Defendants. | Case No: 8:17-cv-01301-CJC-JDE <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> Claim 1 – 42 U.S.C. § 1983 <br><br>     • Count 1 - Unwarranted Seizure <br><br>     • Count 2 - Unwarranted Medical Examination <br><br>     • Count 3 - Unwarranted Vaccinations <br><br> Claim 2 – *Monell*-Related Claims <br><br>     • Count 1 - County of Los Angeles <br><br>     • Count 2 - County of Orange and CHOC Children's Hospital of Orange County <br><br> **[JURY TRIAL DEMANDED]** |

**Jurisdiction and Venue**

1.     Plaintiffs RICARDO BRUNO and RACHEL BRUNO, bring this action pursuant to 42 U.S.C. §1983, *et. seq*., to redress the deprivation of rights secured to them under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, and under federal and state law.

2.     Jurisdiction is conferred pursuant to 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States. These deprivations were inflicted by the Defendants herein, and each of them, in some manner. Each of the Defendants herein were at all relevant times acting under color of law.

3.     Because the acts and omissions complained of herein occurred in the County of Orange, and it is believed that some living parties currently reside in the County of Orange, venue is proper in the United States District Court located in the Central District of California, Southern Division.

4.     Plaintiffs make the following allegations and claims upon personal belief, investigation of their counsel, and on information and belief.

**Parties**

5.     Plaintiffs RICARDO BRUNO and RACHEL BRUNO ("Plaintiffs" or "Ricardo" or "Rachel") are parents who presently reside with their children, L.B. and D.B.[1], in the County of Orange, California, as a family unit. Ricardo Bruno and Rachel Bruno are D.B. and L.B's biological parents and listed as such on each child's birth certificate. Other than as noted herein, at all relevant times these parents resided with their children as a family unit.

/ / /

_____

[1] The names of the two children have been replaced to protect the privacy of the minors.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1     6.    At all times applicable herein, defendant, COUNTY OF LOS

2  ANGELES, was, and is, a public entity ("Los Angeles County" or "County of Los

3  Angeles").

4     7.    At all times applicable herein, defendant, COUNTY OF ORANGE,

5  was, and is, a public entity ("Orange County" or "County of Orange").

6     8.    At all times applicable herein, defendant, CHOC CHILDREN'S

7  HOSPITAL OF ORANGE COUNTY, was, and is, a private not-for-profit

8  corporation ("Children's Hospital" or "CHOC").

9     9.    Plaintiffs are informed and believe and thereon allege that the Los

10  Angeles County Sheriff's Department ("Sheriff's Department") is a subdivision,

11  entity, or administrative arm of defendant, County of Los Angeles.

12     10.    At all times relevant herein, defendant DEPUTY JASON

13  SCHMOKER ("Schmoker"), Partial Badge No. 5254, is and was an individual

14  residing in the County of Los Angeles and employed by the County. On

15  information and belief, Schmoker was an officer, agent, and employee of the Los

16  Angeles County Sheriff's Department ("Sheriff's Department"). Specifically,

17  Schmoker was a Deputy and at all times mentioned herein, Schmoker was acting

18  under color of law and within the course and scope of his duties as a Sheriff's

19  Department agent and/or employee.

20     11.    At all times relevant herein, defendant DETECTIVE MARICRUZ

21  PEREZ ("Perez"), Badge No. 438113, is and was an individual residing in the

22  County of Los Angeles and employed by the County. On information and belief,

23  Perez was an officer, agent, and employee of the Los Angeles County Sheriff's

24  Department ("Sheriff's Department"). Specifically, Perez was a Detective and at

25  all times mentioned herein, Perez was acting under color of law and within the

26  course and scope of her duties as a Sheriff's Department agent and/or employee.

27     12.    At all times relevant herein, defendant DETECTIVE BELEN LEMUS

28  ("Lemus"), Badge No. 447073, is and was an individual residing in the County of

Los Angeles and employed by the County. On information and belief, Lemus was an officer, agent, and employee of the Los Angeles County Sheriff's Department ("Sheriff's Department"). Specifically, Lemus was a Detective and at all times mentioned herein, Lemus was acting under color of law and within the course and scope of her duties as a Sheriff's Department agent and/or employee.

13.     At all times relevant herein, defendant LAURA TODD ("Todd") is and was an individual residing in the County of Orange and employed by the County. On information and belief, Todd was an officer, agent, and employee of Orange County Social Services Agency ("OCSSA"). Specifically, Todd was a Senior Social Worker ("SSW") and at all times mentioned herein, Todd was acting under color of law and within the course and scope of her duties as a OCSSA agent and/or employee.

14.     At all times relevant herein, defendant NICOLE STRATTMAN ("Strattman") is and was an individual residing in the County of Orange and employed by the County. On information and belief, Strattman was an officer, agent, and employee of OCSSA. Specifically, Todd was a Senior Social Services Supervisor ("Supervisor") and at all times mentioned herein, Strattman was acting under color of law and within the course and scope of her duties as a OCSSA agent and/or employee.

15.     At all times relevant herein, defendant DEPUTY J. LEE ("Lee"), Badge No. 522969, is a Los Angeles Sheriff's Deputy and in fact accompanied Defendant Todd and participated in the relevant events on July 9, 2015, as described in greater detail herein. On further information and belief, J. LEE was an officer, agent, and employee of the Los Angeles County Sheriff's Department ("Sheriff's Department"). Specifically, J. LEE was a Deputy and at all times mentioned herein, J. LEE was acting under color of law and within the course and scope of his duties as a Sheriff's Department agent and/or employee.

/ / /

16.     At all times relevant herein, defendant SOCIAL WORKER DOE 1 ("Social Worker Doe 1") is and was an individual residing in the County of Orange and employed by said County. On information and belief, Social Worker Doe 1 was an officer, agent, and employee of OCSSA. Specifically, Social Worker Doe 1 was acting under color of law and within the course and scope of his or her duties as a OCSSA agent and/or employee.

17.     At all times relevant herein, defendant DOCTOR DOE 1 ("Doctor Doe 1") is and was an individual residing in the County of Orange and employed by CHOC. On information and belief, Doctor Doe 1 was an officer, agent, and employee of CHOC. Specifically, Doctor Doe 1 was acting within the course and scope of his or her duties as a CHOC employee when he or she performed a forensic medical examination on D.B. without a warrant or parental consent.

18.     At all times relevant herein, defendant DOCTOR DOE 2 ("Doctor Doe 2") is and was an individual residing in the County of Orange and employed by said County. On information and belief, Doctor Doe 2 was an officer, agent, and employee of the County of Orange. Specifically, Doctor Doe 2 was acting within the course and scope of his or her duties as a County of Orange employee when he or she performed multiple vaccinations on D.B. without a warrant or parental consent.

19.     At all times relevant herein, defendant NURSE DOE 1 ("Nurse Doe 1") is and was an individual residing in the County of Orange and employed by said County. On information and belief, Nurse Doe 1 was an officer, agent, and employee of the County of Orange. Specifically, Nurse Doe 1 was acting within the course and scope of his or her duties as a County of Orange employee when he or she performed multiple vaccinations on D.B. without a warrant or consent.

20.     DEFENDANT DOES 1 through 10 are sued as fictitious names, their true names and capacities being unknown to Plaintiffs. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities.

Each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names.

21.    Plaintiffs make all allegations contained in this Complaint against all Defendants, including DOES 1 through 10.

22.    Whenever reference is made in this complaint to any act of Defendants, such allegations shall be deemed to mean all named Defendants and DOES 1 through 10, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

23.    At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs are informed and believe that each Defendant (including DOES 1 through 10), was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, controlling franchiser, controlling licensor, principal, and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, control and/or joint venture, and each defendant has ratified, approved, conspired in, profited from and/or authorized the acts of each of the remaining Defendants and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

24.    At all times mentioned herein, each of the above identified defendants was an officer and/or agent of the County of Los Angeles and/or the County of Orange – as the case may be, and was acting under color of law within the course and scope of their respective duties in doing the things and acts herein alleged.

25.    As of July 8, 2015, Plaintiffs Ricardo Bruno and Rachel Bruno and their two children, L.B. and D.B., constituted a family unit, entitled to constitutional protections, including, but not limited to, the right to live together free of unwarranted governmental interference, the right to familial privacy, and the right of parents to reasonably direct the upbringing of their children, including medical care and medical decisions for their children.

26.    In addition, Plaintiffs and their children enjoyed a separate and distinct right to live together without undue governmental interference.

27.    As of July 8, 2015, when L.A. County Sheriff's Department entered and forever changed their lives, L.B. was 7 weeks old and D.B. was 20 months old. Ricardo and Rachel had been properly caring for D.B and L.B. and enjoyed a strong and loving bond with them.

28.    Rachel has a diagnosed seizure disorder which requires her to have uninterrupted sleep. At the time of the events described herein, Rachel had not had a seizure for approximately two years.

–    ***The Family Hires a Doula to Help Care For L.B.***

29.    To ensure Rachel has her required uninterrupted sleep, the Brunos hired a doula, Ms. Shannon King (Ms. King), to help care for L.B. A doula is a non-medical assistant who provides physical assistance, such as feeding, and helps care for infants.

30.    On July 7, 2015, Rachel, L.B., and D.B. spent the day in the home of maternal grandmother, Tereza Chandler (Mrs. Chandler). Ricardo was out of town on a business trip. Rachel and L.B. returned to Rachel's home followed by Mrs. Chandler and D.B. at about 7:00 p.m. Shortly thereafter, Rachel put L.B. and D.B. to bed. Ms. King's normal working hours were 10:00 p.m. through 6:00 a.m. at Rachel's home for several days a week. When Ms. King came to the Bruno home on July 7, 2015 to start her shift, L.B. was healthy and in good spirits. He

exhibited not signs of injury or distress. Ms. King fed L.B. at 11:00 p.m on July 7, 2015 and at 4:00 a.m. on July 8, 2015.

### – *L.B. Begins to Display Symptoms of an Injury*

31.     At about 4:00-4:30 a.m. on July 8, 2015, Rachel heard L.B. crying and got up to see why L.B. was crying. Rachel saw Ms. King patting L.B. on the chest as he was laying face up in his crib. Rachel sent Ms. King away. At that point, Rachel unswaddled L.B. and placed him on her chest in an attempt to get him to sleep. L.B. intermittently slept and cried on her chest between approximately 5:00 a.m. and 7:00 a.m.

32.     L.B. was fussy until 7:00 a.m. Rachel noticed L.B.'s right arm was twitching. Rachel attempted to feed L.B. at 7:00 a.m., but L.B. would not eat. L.B. slept peacefully from 7:00 - 9:00 a.m., while Rachel took care of D.B.

33.     At 10:00 a.m., L.B. refused to feed again. Rachel noticed nothing unusual about L.B. at that time and put L.B. into his crib. However, L.B. woke up at 10:30 a.m. At this time, Rachel noted that L.B. was pale and appeared to be in pain.

34.     Rachel immediately called L.B.'s pediatrician, and spoke with the receptionist. Rachel gave the receptionist a summary of L.B.'s symptoms. Rachel reported L.B. was crying and not eating. The receptionist informed Rachel that L.B.'s pediatrician would not be available until 3:15 p.m. Rachel was advised to take L.B. to the hospital.

### – *Rachel Takes L.B. to The Hospital*

35.     Immediately following her phone call, Rachel brought L.B. to CHOC Children's Hospital of Orange County (CHOC). Rachel had already contacted Mrs. Chandler to supervise and care for D.B.

36.     L.B. slept in a car seat during the ride to CHOC. During the trip to CHOC, L.B.'s arm twitched and he pulled on Mrs. Chandler's finger.

/ / /

37. L.B. was admitted to the hospital at around 12:30 p.m. on July 8, 2015.

38. L.B. undergoes a CT scan and is found to have a displaced skull fracture and a hemorrhage. L.B. requires an emergency procedure to remove the blood clot. All evidence points to the doula as the person who injured L.B.

39. At approximately 1:30 p.m., L.B underwent a successful surgical procedure, which lasted between three and four hours. L.B. was placed in the Pediatric Intensive Care Unit, where Rachel waited.

40. At around 5:30 p.m., D.B. was taken by Mrs. Chandler to Mrs. Chandler's home. D.B. was in perfect physical health and condition at this time and was being cared for by Mrs. Chandler.

– ***Orange County Social Services Agency Gets Involved***

41. At some time that evening, an unnamed person from CHOC contacted Orange County Social Services Agency.

42. Senior Social Worker Laura Todd and Public Health Nurse Hang Trinh contacted Dr. Daphne Wong (Dr. Wong). Dr. Wong gave Todd a summary of L.B.'s injuries. Dr. Wong also told Todd that Ricardo was currently out of state but would arrive home later that day.

43. Dr. Wong advised Todd that L.B. would be staying at the hospital through the morning of July 9, 2015 for additional testing. Rachel told Todd that she would be spending the night in the hospital with L.B. and would pursue any and all necessary medical treatment for L.B. Thus, there was sufficient time for Todd, or anyone else, to obtain a warrant if it appeared detention of the child, or children was necessary in order to avert further injury.

44. Dr. Wong did not tell Todd that Rachel might attempt to flee with L.B. Further, Dr. Wong voiced no concerns that L.B. was in immediate risk of further injury or death within the time it would have taken to obtain a warrant. At

no point in time did Dr. Wong tell any Defendant that Rachel caused any of L.B.'s injuries.

*–* ***Social Worker Defendant Todd Call The Los Angeles County Sheriff's Department***

45.     Todd got a hold of the L.A. Sheriff's Department on July 8, 2015, to request assistance. Deputy Jason Schmoker responded to the call at CHOC.

46.     Together, Todd and Deputy Schmoker interviewed Rachel. Schmoker repeatedly badgered Rachel about whether she had a seizure recently. Rachel provided a summary to Todd and Schmoker. Rachel explained that she has not had any recent seizures, and that she was actively taking prescribed medication to treat her seizures.

47.     Rachel told both Todd and Schmoker that Ricardo had been out of town since July 5, 2015, but would be returning at around 8:30 p.m. As Ricardo was out of town, Todd and Schmoker both knew that there was no possibility that he caused any injury to L.B.

48.     Rachel informed both Todd and Schmoker that she was unaware of how L.B. was injured. Rachel also informed Todd and Schmoker that Ms. King was taking care of L.B. on the night of July 7, 2015.

49.     At this time, D.B. remained with Mrs. Chandler at the grandparents' home. Rachel stayed in the hospital overnight with L.B. Rachel told Todd and Schmoker of D.B.'s location. Rachel then called Mrs. Chandler to let her know that Todd would be checking on D.B. later that night.

*–* ***Detective Perez Arrives at The Hospital and Forms a Plan to Seize Both Children (L.B. and D.B.) Without First Obtaining a Warrant***

50.     Deputy Schmoker called the Special Victims Bureau at around 9:00 p.m. on July 8, 2015. Deputy Schmoker spoke to Detective Maricruz Perez (Perez) over the phone about his conversations with the various witnesses at CHOC.

1    51.    At approximately 10:30 p.m., Ricardo arrived at CHOC. He had

2    flown into LAX and immediately headed to CHOC from the airport. Ricardo told

3    Schmoker that he had been on a business trip since July 5, 2015. Moreover,

4    Ricardo told Schmoker that he did not know how L.B. was injured. Regardless,

5    there was no possibility that Ricardo caused any harm to L.B. because he had been

6    out of town during the time period that L.B. sustained injury.

7    52.    Detective Maricruz Perez (Perez) and Detective Belen Lemus

8    (Lemus) arrived at CHOC at 12:30 a.m. on July 9, 2015. Perez and Todd

9    repeatedly badgered Rachel about whether she had postpartum depression. Rachel

10   confirmed she did not. On July 9, 2015, Defendants Perez, Lemus, Schmoker, and

11   Todd, and each of them, discussed L.B.'s proposed seizure and removal from

12   Plaintiffs' custody. Defendants Perez, Lemus, Schmoker, and Todd, and each of

13   them, agreed to seize L.B. from his parents' care, without prior judicial

14   authorization and/or court order. At the time they seized the child, L.B., they

15   knew, as any reasonable government official would, that it is unlawful to seize a

16   child from the custody of its parents without first obtaining a warrant, unless at the

17   time of the seizure the government agent is in possession of specific and

18   articulable evidence to show that the child is in immediate danger of suffering

19   severe bodily injury or death in the time it takes to obtain a warrant – and, that

20   there is no lesser intrusive alternative means of averting that specific injury.

21   53.    Before seizing the child D.B., without first obtaining a warrant, Perez,

22   Lemus, Schmoker, and Todd, and each of them, discussed D.B.'s proposed seizure

23   and removal from Plaintiffs' custody. Defendants Perez, Lemus, Schmoker, and

24   Todd, and each of them, agreed to also seize D.B. without judicial authorization

25   and/or court order. At the time they seized the child, D.B., they knew, as any

26   reasonable government official would, that it is unlawful to seize a child from the

27   custody of its parents without first obtaining a warrant, unless at the time of the

28   seizure the government agent is in possession of specific and articulable evidence

to show that the child is in immediate danger of suffering severe bodily injury or death in the time it takes to obtain a warrant – and, that there is no lesser intrusive alternative means of averting that specific injury. Nonetheless, Defendants Perez, Lemus, Schmoker, and Todd, and each of them, agreed to seize D.B., and did in fact seize D.B. without a warrant, and in the absence of any exigent circumstance. The details of how this all came about follow.

> ### – *Defendant Todd Consults With Her Supervisor, Defendant Strattman, Regarding The Unwarranted Seizures of L.B. and D.B*

54. After speaking with Perez, Todd consulted by phone with Senior Social Services Supervisor Nicole Strattman regarding the conversation.

55. Todd explained to Strattman that L.B. would be in the hospital for a then unknown period of time. Due to L.B.'s injuries, he was unable to leave the hospital. At this point, there was plenty of time to obtain a warrant.

56. Todd and Strattman together concluded that no exigent circumstances existed for either L.B. or D.B.'s unwarranted seizure. Todd and Strattman were both aware that Ricardo was already home and could not have injured L.B. Indeed, Todd stated that the normal protocol in this situation would be to obtain a protective custody warrant before removing either child. However, even in the face of their aforementioned acknowledged understanding, Todd, Strattman, and Perez agree to seize both L.B. and D.B. from their parents' custody without obtaining a warrant – even though there was no evidence whatsoever to suggest that any form of exigent circumstance existed.

57. Perez requested that Todd not interview Ricardo. Perez also stated that Todd should not attempt to locate or interview Ms. King prior to Perez conducting her interrogations.

/ / /

/ / /

/ / /

**–** ***Defendants Act on Their Earlier Plan to Seize L.B. Without First Obtaining a Warrant***

58.     On information and belief, without any evidentiary basis to do so, L.A. Sheriff's Department employees Deputy Schmoker and/or Detective Perez placed a hospital hold on L.B., thereby seizing him from the care and custody of both of his parents. At no point did Schmoker, Perez, Lemus, Todd, or Strattman consider lesser intrusive measures of ensuring L.B.'s safety. Not only that, but at the time of the placement of the hold, the child was still in the hospital under the watchful eyes of medical staff, and he was nowhere near ready for discharge.

59.     Moreover, at the time of the seizure, Ricardo was present and available at CHOC. At no point did Schmoker, Perez, Lemus, Todd, or Strattman consider only excluding Rachel from the hospital room where L.B. was placed. At no point did Schmoker, Perez, Lemus, Todd, or Strattman seek to obtain a warrant prior to seizing L.B. from his parents. Ricardo was present at CHOC at the time of L.B.'s seizure. At no point did Schmoker, Perez, Lemus, Todd, or Strattman consider placing L.B. into Ricardo's care.

60.     Prior to L.B.'s unwarranted seizure, Todd and Strattman had concluded that there were no exigent circumstances necessitating L.B.'s immediate seizure from his parents' custody. They agreed that the protocol for a child in L.B.'s situation would be to obtain a warrant prior to removal. However, none of the individual Defendants obtained such a warrant. Moreover, all individual Defendants agreed to and participated in L.B.'s unwarranted seizure. Both Rachel and Ricardo did not consent to L.B.'s seizure.

61.     L.B. was seized without judicial authorization or a court order. Ricardo and Rachel did not consent to L.B.'s seizure. At the time of seizure, L.B. was receiving appropriate medial treatment and care – and remained in the hospital under the supervision of medical staff. There was no evidence that Rachel

had physically abused L.B. There was no evidence that L.B. was in immediate danger of suffering serious bodily injury at the hands of his mother or father.

62.    Indeed, safety and risk assessments performed after L.B.'s seizure indicated the L.B. was safe in the home with his parents. There was no evidence whatsoever to suggest that the child, L.B., was in immediate danger of suffering severe bodily injury or death in the time it would have taken a reasonable social worker or sheriff's deputy to obtain a warrant.

63.    This non-consensual and unwarranted seizure of L.B. was unlawful and in violation of Plaintiffs' Due Process rights, familial association rights, liberty interests, and familial privacy, arising under and guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

–    ***Defendants Seize The Child, D.B., Without a Warrant or Consent, and in the Absence of Exigent Circumstances***

64.    At around 1:00 a.m. on July 9, 2015, Todd and Lee went to Ms. Chandler's home with the intent to seize D.B. At around 2:30 a.m. on July 9, 2015, Todd and Lee arrive at Ms. Chandler's home and seize D.B. At the time of the seizure, D.B. was in the care of his grandmother, Mrs. Chandler, and his step-grandfather, Mr. Chandler. Indeed, D.B. regularly spent time with his grandparents in their home. D.B. had spent at least some time everyday for the past month at their home.

65.    Todd and Lee did not inform either Rachel or Ricardo that they would be seizing D.B. Instead, Todd lied to Rachel – telling Rachel that she was simply performing an inspection of D.B. at the grandparents' home. Rachel did not learn of D.B.'s unwarranted seizure until the next day.

66.    Upon learning that Todd and Lee were there to seize D.B., the grandparents pled and begged to have D.B. remain in their care. Their pleas fell on deaf ears.

///

67. Rather than consider leaving D.B. with his loving grandparents, Todd and Lee seized D.B. without a warrant. Instead of leaving D.B. with relatives, Todd then took D.B. to Orangewood Children and Family Center, an emergency foster shelter owned and operated by the County of Orange.

68. The grandparents asked that they be considered as a placement for L.B. and D.B. if the children were not immediately returned to their parents as there were no other relatives in the United States.

69. D.B. was seized without judicial authorization or a court order and in the absence of any exigent circumstances. Ricardo and Rachel did not consent to D.B.'s seizure. There were no allegations or evidence that either Rachel or Ricardo had physically abused D.B. There was no evidence that D.B. was in immediate danger of suffering serious bodily injury at the time of his unwarranted seizure. D.B. had no signs of visible injuries, marks, or bruises. At the time D.B. was seized from the care of his grandparents, he was healthy and had no medical problems. Instead, D.B.'s seizure was solely based on the fact that his brother, L.B., had been seized – which was itself without just cause or a warrant.

70. At the time of D.B.'s unwarranted seizure, Ricardo was in town and available to care for D.B. At the time of seizure, both Ricardo and Rachel were willing and able to make arrangements for D.B.'s care, such as leaving him in the care of his grandparents.

71. At the time D.B. was seized, there were no allegations that D.B. had been, or potentially would be, harmed by anyone – ever. Rachel was not even present at the grandparents' home. There was no danger to D.B. at the time he was seized. Indeed, the grandparents' home had all the necessary amenities, including a crib, for D.B.

72. D.B. was forced to remain in the Orangewood foster facility for over two days – away from the familiar surroundings of his home and the loving care of his family.

73.   At the time of each seizure, i.e., the seizure of L.B. and/or the seizure of D.B., other more reasonable and less intrusive alternative means existed to secure the children's safety other than their unwarranted seizure and detention from their home and the loving care of their parents. In spite of this, these Defendants Todd, Strattman, Schmoker, Lemus, and Perez, and each of them, intentionally, or with reckless or malicious disregard for Plaintiffs' rights, failed and/or refused to pursue or investigate any such lesser intrusive alternative means of keeping the family together. Instead, Defendants Todd, Strattman, Schmoker, Lemus, and Perez, and each of them, seized L.B. and D.B. – without judicial authorization, and without evidence of any underlying exigent circumstance.

***– Defendants Subject D.B. to an Intrusive and Unwarranted Forensic Medical Examination***

74.   At some point after D.B.'s seizure, Ricardo is informed that D.B. is in Social Services' custody. Ricardo specifically tells Social Services not to perform medical tests on D.B. as D.B. is healthy and the experience would traumatize him. Moreover, Ricardo specifically requests that he be with D.B. if D.B. is in the hospital or medically examined. But, Social Worker Doe 1 directed that D.B. to be medically examined in direct contravention of Ricardo's demands.

75.   Social Worker Doe 1 never notified either Rachel or Ricardo prior to the examination where or when the examination would be performed.

76.   At this time, D.B. was healthy, exhibited no signs of abuse, showed no signs of any type of injury, had no medical problems, and was not in need of any medical attention. There were no allegations that Ricardo and/or Rachel caused any harm to D.B whatsoever.

77.   Nonetheless, without any reasonable basis to conduct a forensic medical examination on D.B., Doctor Doe 1 and CHOC performed a complete investigatory forensic medical examination of D.B. At the time D.B. was

examined, Ricardo was in town and available to accompany D.B. Moreover, there was plenty of time to obtain a warrant permitting the investigatory examination.

78. D.B. was subjected to invasive forensic medical examinations, including skeletal surveys, at CHOC without the consent or presence of either Rachel or Ricardo. These examinations were performed by Doctor Doe 1 at the request of Social Worker Doe 1.

79. At the time of this forensic medical examination, the Detention hearing, or any other court hearing, had not yet taken place, and the Juvenile Court had not considered any evidence or argument – at all – relevant to D.B. and L.B.'s removal and/or detention.

80. The invasive forensic medical examination was done without parental notice or consent, and without a warrant or other similar court order authorizing such an invasive procedure. No one even bothered to attempt to obtain a court order authorizing the examination.

81. D.B.'s tests were normal and indicated that he was not the victim of sexual abuse or physical abuse. At no point does any agency allege that D.B. suffered harm of any kind.

82. These traumatizing examinations were performed even though there were no allegations that D.B. had been injured in any way.

– ***D.B. is Subjected to Multiple Invasive Medical Procedures Including Forced Vaccinations***

83. While D.B. was in the County's custody, Social Worker Doe 1 also directed that D.B. be administered seven separate vaccinations in direct contravention of Ricardo's demand that no such medical procedures be done, and his demand to be present for any medical procedure that was done.

84. Social Worker Doe 1 never notified either Rachel or Ricardo prior to the procedures where or when the procedures would be performed. Nor did Social Worker Doe 1 seek or obtain either parents' consent to said procedures.

85.     At this time, D.B. was healthy, had no medical problems, and was not in need of any medical attention.

86.     Nonetheless, without any reasonable basis to conduct multiple vaccinations on D.B., Doctor Doe 2, Nurse Doe 1, and each of them, performed several sets of vaccinations on D.B. At the time D.B. was vaccinated, Ricardo was in town and available to accompany D.B.

87.     Moreover, D.B. was on a modified vaccination schedule by his parents and with the approval of his primary pediatrician at the time of these unwarranted medical procedures. These unwarranted medical procedures disrupted the family's medically approved delayed vaccination schedule, violating the parents' constitutional rights to make medical decisions for their child.

88.     Defendants made no efforts to ascertain D.B.'s medical history. Defendants made no efforts to determine what vaccines D.B. had received before performing their unwarranted medical procedures.

89.     Indeed, one of the vaccines Defendants inflicted on D.B. contained an ingredient, PREVNAR13, to which D.B. had previous negative allergic reactions. D.B.'s primary pediatrician and his parents had agreed to no longer administer that particular vaccine to avoid future reactions as well as potential long-term ramifications and complications. Without the parents' knowledge or consent, Defendants, and each of them, injected D.B. with that vaccine anyway.

90.     At the time of these medical procedures, the Detention hearing, or any other court hearing, had not taken place, and the Juvenile Court had not considered any evidence or argument – at all – relevant to either D.B. and L.B.'s removal and/or detention.

91.     The medical procedures were done without parental notice or consent, and without a warrant or other similar court order authorizing such an invasive procedure. No one even bothered to attempt to obtain a court order authorizing the seven unwarranted, unscheduled, and potentially dangerous vaccinations.

92.    Indeed, Rachel and Ricardo did not learn that the vaccinations had occurred until they received the medical documentation upon D.B.'s return from Orangewood. Rachel and Ricardo only learned that D.B. had been subjected to these unwarranted medical procedures from the Chandlers, D.B.'s grandparents, upon D.B.'s discharge. No Defendant, County employee, or doctor ever informed Rachel and Ricardo that these procedures had been performed or sought either Rachel's or Ricardo's consent.

–    ***D.B.'s Unwarranted Medical Examination and Medical Procedures were Performed at The Direction of Orange County Social Workers and Pursuant to Contract***

93.    In accordance with the terms of Defendant CHOC's contract with OCSSA, consistent with Defendants' standard operating procedures, pursuant to contract, and at the specific request of OCSSA, D.B. was subjected to a complete forensic medical examination – which included a full skeletal survey. (*See* Exh. D.) No evidence of abuse of any kind was found.

94.    Defendants Doctor Doe 1 and CHOC performed the forensic medical examination at issue in this case pursuant to contract, and at the behest of Orange County. (*See* Exh. D.) No one sought or obtained a warrant or other similar court order authorizing D.B.'s invasive forensic medical evaluations prior to the examination being conducted. At no point in time did Defendants, or anyone else, ever seek or obtain consent from D.B.'s parents to conduct an invasive forensic medical examination.

95.    The conducting of forensic medical examinations is a traditional governmental function. Defendants CHOC and Doctor Doe 1 regularly perform forensic medical examinations at the specific request of, and pursuant to contract with, Defendant Orange County and law enforcement during juvenile dependency and criminal investigations. (*See* Exh. D.) In exchange for money, Defendants voluntarily collaborated with and jointly participated in the investigative actions

undertaken by Orange County social workers in the underlying case, including the unwarranted and non-consensual forensic medical examination of D.B. (Exh. D.)

96.    Moreover, Defendants Doctor Doe 2, Nurse Doe 1, and each of them, performed the vaccinations at issue in this case pursuant to contract, and at the behest of Orange County and/or its social workers. No one sought or obtained a warrant or other similar court order authorizing D.B.'s invasive medical procedures prior to the vaccinations being administered. At no point in time did Defendants, or anyone else, ever seek or obtain consent from D.B.'s parents to conduct these invasive medical procedures.

97.    As a general matter of practice and pursuant to contract, CHOC regularly follows directives and instructions given by Orange County social workers which necessarily interfere with parents' custodial rights and/or rights to control the medical care of their children, without first requiring that a court order, warrant, or parental consent be sought or obtained. (*See* Exhs. C-D.)

98.    CHOC does not train its staff regarding the constitutional rights that run between children and parents, or that a court order is required to conduct a non-emergency forensic medical examination of a child. None of the Defendants do anything to ensure that a court order or warrant permitting the forensic medical examinations of children in non-emergency circumstances has been issued, or that any parent has consented to such an examination – or even has knowledge of it.

99.    In addition, none of these Defendants ever do anything to ensure that a court order or warrant permitting the vaccination of children has been issued, or that any parent has consented to such a procedure.

100.    On information and belief, as a general matter of practice and pursuant to contract, CHOC regularly foregoes any consultation with Orange County to determine whether D.B.'s forensic medical examination or vaccinations were appropriate and/or necessary. Instead, CHOC performs forensic medical examinations and non-emergency medical procedures pursuant to contract and at

the specific request and direction of Orange County – without any consideration as to whether the examinations or procedures are appropriate and/or necessary.

101.    As a matter of custom, and practice the Defendants, and each of them, regularly conduct similar unwarranted invasive forensic medical evaluations and procedures pursuant to contract and at the behest of Orange County on a continuous and regular basis for every child that is presented to CHOC by Orange County social workers or other law enforcement personnel. (Exh. D.)

   –   *L.B. is Discharged From The Hospital on July 20, 2015; Rachel is Forces to Move Out of the Family Home*

102.    Rachel Bruno was forced to move out of the family home due to the unsupported, and knowingly unsupportable allegations by the L.A. Sheriff's Department and the Orange County social workers. Moreover, she was forced into a limited visitation schedule that severely affected her relationship and bonds with her children.

103.    On July 20, 2015, L.B. was discharged from the hospital back to the care and custody of Ricardo Bruno. At this point, L.B. had been in the hospital's care for around 12 days.

## FIRST CLAIM – Violation of Civil Rights (42 U.S.C. §1983)

### COUNT 1

**(Procedural Due Process, Unlawful Seizure, Invasion of Privacy, and Interruption of Familial Association/Failure to Intercede)**

**By PLAINTIFFS RICARDO AND RACHEL BRUNO**

**Against Defendants, SCHMOKER, PEREZ, LEMUS, LEE, TODD, STRATTMAN and DOES 1 through 10, inclusive**

104.    Plaintiffs Ricardo Bruno and Rachel Bruno incorporate the above allegations of fact and law as though fully set forth herein.

/ / /

105.  Plaintiffs Ricardo Bruno and Rachel Bruno are individuals and citizens of the United States, protected by 42 U.S.C. §1983, et seq.

106.  At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was so very "clearly established" that any reasonable social services agent and/or police officer or other law enforcement officer in Defendants' situation would know it is unlawful to seize a child from the care, custody, and control of its parents or to question, threaten, examine, or search a child in the absence of exigent circumstances without first obtaining a warrant to do so. Furthermore, any such reasonable social worker and/or police officer would know that to do so would constitute a violation of the parents', and children's, well-elaborated constitutional right to live together without governmental interference – which rights are protected under the First and Fourteenth Amendments to the United States Constitution.

107.  Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize, acknowledge, and respect the Plaintiffs' rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed Plaintiffs under the United States Constitution, including, without limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

108.  Defendants, and each of them, at all relevant times herein were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired, to violate Plaintiffs' constitutional rights by, but not limited to, removing, detaining, and continuing to detain L.B. and D.B. from the care, custody, and control of their parents, without proper or just cause and/or authority, in the absence of any exigency, and without first obtaining a warrant or other court

order – thereby violating Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

109.   None of the Defendants sought, or obtained, a protective custody warrant – or any other type of warrant or court order, prior to seizing L.B. or D.B. Defendants, and each of them, jointly acted or conspired to seize the child, as described above, knowing that no  warrant authorizing either child's seizure issued and that exigent circumstances did not exist. They also knew that neither parent consented to said unwarranted seizure.

110.   At no time *ever* did any of the Defendants have any specific, articulable evidence to support any reasonable basis to believe that any of Plaintiffs' children were in immediate danger of sustaining serious bodily injury or death within the time it would have taken the Defendants to seek and obtain a warrant authorizing the children's seizure. Indeed, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, purposefully, knowingly, and/or recklessly failed to seek a warrant, in knowing contravention and derogation of Plaintiffs' clearly established rights to due process and familial association.

111.   In the alternative, with respect to TODD, through her extensive training as an Orange County social worker, on information and belief, she was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, she was equally aware through her training and experience that she had an affirmative obligation to intercede and intervene to protect the rights of citizens, like Plaintiffs, when she witnessed constitutional rights being violated by other government agents. Not only did she stand by and fail to intercede and intervene on Plaintiffs' behalf – she went so far as to provide agreement, concurrence, and support for PEREZ and SCHMOKER when together they seized L.B. and D.B.

from the custody of their parents without a warrant and in the absence of any exigency.

112.   In the alternative, with respect to Detective LEMUS, through her extensive training as a detective, on information and belief, she was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, she was equally aware through her training and experience that she had an affirmative obligation to intercede and intervene to protect the rights of citizens, like Plaintiffs, when she witnessed their constitutional rights being violated by fellow officers. Not only did she stand by and fail to intercede and intervene on Plaintiffs' behalf – she went so far as to provide agreement, concurrence, and armed support for PEREZ and SCHMOKER when together they seized L.B. and D.B. without a warrant and in the absence of any exigency.

113.   In the alternative, with respect to Deputy SCHMOKER, through his extensive training as a sheriff's deputy, on information and belief, he was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, he was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of citizens, like Plaintiffs, when he witnessed their constitutional rights being violated by fellow officers. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf – he went so far as to provide agreement, concurrence, and armed support for PEREZ and LEMUS when together they seized L.B. and D.B. without a warrant and in the absence of any exigency.

114.   In the alternative, with respect to Deputy LEE, through his extensive training as a sheriff's deputy, on information and belief, he was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, he was equally aware

through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of citizens, like Plaintiffs, when he witnessed their constitutional rights being violated by fellow officers. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf – he went so far as to provide agreement, concurrence, and armed support for TODD, PEREZ and SCHMOKER when together they seized D.B. without a warrant and in the absence of any exigency.

115.    No reasonable government agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting and/or failing to intercede or intervene to stop the unwarranted seizure of Plaintiffs' children, under the circumstances then presented was lawful.

116.    As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety, emotional distress, pain and anguish, among other things.

117.    Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

### COUNT 2

**(Deprivation of Constitutional Rights – Non-Consensual and Unwarranted Forensic Medical Examination)**

### By PLAINTIFFS RICARDO AND RACHEL BRUNO

**Against Defendants, SOCIAL WORKER DOE 1, DOCTOR DOE 1, CHOC CHILDREN'S OF HOSPITAL ORANGE COUNTY, and DOES 1 through 10, inclusive**

118.    Plaintiffs Ricardo Bruno and Rachel Bruno incorporate the above allegations of fact and law as though fully set forth herein.

1   119.   Plaintiffs Ricardo Bruno and Rachel Bruno are individuals and
2   citizens of the United States, protected by 42 U.S.C. §1983, et seq.

3   120.   At all times relevant hereto, the constitutional right to remain free of
4   non-consensual intrusive forensic medical examinations was "clearly established"
5   such that any reasonable person in Defendants' circumstances would know that it
6   is a violation of the parents' constitutional rights to subject the child to a forensic
7   medical examination without just cause, parental consent, or a court order/warrant
8   authorizing the examination. *See Swartwood v. County of San Diego*, 84 F. Supp.
9   3d 1093, 1116-1117 (S.D. Cal. 2014) ["[T]he Constitution assures parents, in the
10  absence of parental consent, physical examinations of their child may not be
11  undertaken for investigative purposes at the behest of state officials unless a
12  judicial officer has determined, upon notice to the parents, and an opportunity to
13  be heard, that grounds for such an examination exist and that the administration of
14  the procedure is reasonable under all the circumstances."] Barring a reasonable
15  concern that material physical evidence might dissipate, or that some urgent
16  medical problem exists requiring immediate attention, the state is required to
17  notify parents and to obtain judicial approval before children are subjected to
18  investigatory physical examinations. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th
19  Cir. Cal. 2000).

20  121.   Defendants Doctor Doe 1, Social Worker Doe 1, CHOC, and each of
21  them, performed the forensic medical examination of D.B. at issue in this case. No
22  one sought or obtained a warrant or other similar court order authorizing D.B.'s
23  invasive forensic medical evaluations prior to the examination being conducted.
24  At no point in time did Defendants, or anyone else, ever seek or obtain consent
25  from D.B.'s parents to conduct an invasive forensic medical examination.

26  122.   D.B. was subjected to invasive forensic medical examinations,
27  including skeletal surveys, at CHOC without the consent, knowledge, or presence

28

of either Plaintiff. These examinations were performed by Doctor Doe 1 at the request of Social Worker Doe 1.

123.   Defendants Doctor Doe 1 and CHOC performed the forensic medical examination, a traditional government function, at issue in this case pursuant to contract, and at the behest of Orange County. (Exh. D.) There was no reasonable basis to conduct a forensic medical examination on D.B.

124.   No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting the warrantless forensic medical examination of D.B. under the circumstances then presented, was lawful.

125.   As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

126.   Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiff is entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

### COUNT 3

**(Deprivation of Constitutional Rights – Non-Consensual Unwarranted Medical Procedures - Vaccinations)**
**By PLAINTIFFS RICARDO AND RACHEL BRUNO**

**Against Defendants, SOCIAL WORKER DOE 1, DOCTOR DOE 2, NURSE DOE 1, and DOES 1 through 10, inclusive**

127.   Plaintiffs Ricardo Bruno and Rachel Bruno incorporate the above allegations of fact and law as though fully set forth herein.

128.   Plaintiffs Ricardo Bruno and Rachel Bruno are individuals and citizens of the United States, protected by 42 U.S.C. §1983, et seq.

129.   At all times relevant hereto, the constitutional right to remain free of non-consensual intrusive medical procedures was "clearly established" such that

any reasonable person in Defendants' circumstances would know that it is a violation of the parents' constitutional rights to subject the child to multiple vaccinations without just cause, parental consent, or a court order/warrant authorizing the procedure. *See Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). Parents have a guaranteed constitutional right arising from the liberty interest in family association to be with their children while they are receiving medical attention or undergoing medical procedures. *Id.* at 1142. This constitutional right to familial association includes the right of parents to make important medical decisions for their children. *Id.* at 1141.

130. Defendants Doctor Doe 2, Nurse Doe 1, Social Worker Doe 1, and each of them, performed the multiple vaccinations at issue in this case. No one sought or obtained a warrant or other similar court order authorizing D.B.'s invasive medical procedures prior to the vaccinations being conducted. At no point in time did Defendants, or anyone else, ever seek or obtain consent from D.B.'s parents to conduct any of the seven vaccinations.

131. D.B. was subjected to invasive medical procedures, including seven vaccinations, without the consent or presence of either Plaintiff. These examinations were performed by Doctor Doe 2 and Nurse Doe 1 at the request of Social Worker Doe 1.

132. Social Worker Doe 1 never notified Plaintiffs prior to the procedure where or when the vaccinations would be performed. At this time, D.B. was healthy, exhibited no signs of abuse, showed no signs of any type of injury, had no medical problems, and was not in need of any medical attention.

133. Defendants Doctor Doe 2, Nurse Doe 1, and each of them, performed the unwarranted vaccinations, an invasive medical procedure, at issue in this case pursuant to contract, and at the behest of Orange County. There was no reasonable basis to perform these procedures on D.B.

/ / /

134.   No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting the multiple unwarranted vaccinations performed on D.B. without parental consent under the circumstances then presented, was lawful.

135.   As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

136.   Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiff is entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

## SECOND CLAIM – *Monell*-Related Claims

### COUNT 1

**By PLAINTIFFS RICARDO AND RACHEL BRUNO**

**Against COUNTY OF LOS ANGELES**

137.   Plaintiffs Ricardo Bruno and Rachel Bruno incorporate the above allegations of fact and law as though fully set forth herein.

138.   Defendant County of Los Angeles, including through its sheriff's department, is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. *Monell v. Dept. of Social Services* (1978) 436 U.S. 658. Defendants, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Ricardo Bruno and Rachel Bruno's rights.

139.   Defendant County of Los Angeles, including through its entity the L.A. Sheriff's Department, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiff to establish, implement and follow policies, procedures, customs and/or practices which

**FIRST AMENDED COMPLAINT FOR DAMAGES**

confirm and provide the protections guaranteed Plaintiff under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

140. Defendant County of Los Angeles also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within the L.A. Sheriff's Department, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

141. Moreover, based on the duties charged to the L.A. Sheriff's Department and its officers, including the powers to seize children from their parents' care, the County and its policymaking officials knew or should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of parents and their children with whom their agents regularly came into contact – and to adequately train its employees on constitutionally appropriate policies and practices.

142. Defendant County of Los Angeles established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the L.A. Sheriff's Department and its officers when they violated Plaintiffs' constitutional rights by seizing L.B. and D.B. from Plaintiffs' care and custody without first obtaining a warrant where the children were in no danger of suffering severe bodily injury or death in the time it would have taken to obtain a warrant, among other things.

143. In addition, Defendant County of Los Angeles established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the L.A. Sheriff's Department and its officers when they violated Plaintiffs' constitutional

rights by continuing to detain L.B. and D.B. and/or by causing L.B. and D.B. to continue to be detained from Plaintiffs' custody when it was known that there was not a basis to do so.

144.   At the time of the underlying events, the regularly established customs and practices of the County of Los Angeles's Sheriff's Department that were followed, adhered to, complied with, and carried out by SCHMOKER, PEREZ, LEMUS, LEE, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

a.   The custom and/or practice of detaining and/or removing children from the custody of their parents in the absence of exigent circumstances (immediate danger of serious bodily injury), without first obtaining a court order/warrant, without first engaging in a reasonable investigation, and/or first obtaining consent of the child's parent;

b.   The policy, custom, and/or practice of removing children from their family and their homes without first performing and/or pursuing any and/or reasonable investigation, and then only investigating allegations of abuse, after the unwarranted seizure is *fait accompli*;

c.   The policy, custom, and/or practice of removing and detaining children, and continuing to detain them for an unreasonable period long after any alleged basis for detention is negated or otherwise known to lack merit;

d.   The policy, custom, and/or practice of causing the continued detention of a child to be prolonged even though there is no factual basis to support the continued detention of the child;

e.   The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom L.A. Sheriff's Department officers can regularly be expected to come into contact by failing and/or refusing to implement a practice

of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First and Fourteenth Amendments to the United States Constitution.[2]

145.   Each of the above enumerated customs, policies, or practices is evidenced by the consistent failure on the part of the County of Los Angeles to investigate violations of constitutional rights by law enforcement officers of a similar nature; and, the consistent failure by the L.A. Sheriff's Department to discipline its officers and their supervisors who are involved in constitutional violations of a similar nature so that violations of citizen's constitutional rights have not only become accepted, but are customary.

146.   On information and belief, Defendant County of Los Angeles has engaged in each of the customs and/or practices identified above on an ongoing and continuous basis since at least 2004, if not earlier, and continues to engage in these practices on an ongoing and daily basis.

147.   The Defendant County of Los Angeles is aware that its officers seize children from the care of their parents without first obtaining judicial authorization, parental consent, and/or pursuing reasonable avenues of investigation, when there is no emergency circumstance and in contravention of the rights of both parents and children. Yet, Defendant County of Los Angeles made a knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their officers to inform them of the rights of

---

[2]This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

parents and children to remain together absent undue government interference, the obligation of the officers to first obtain a warrant before seizing children from their parents when no exigency exists.

148.   Defendant County of Los Angeles failed to establish, adopt, and/or implement policies, procedures, and training regarding the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments. Without such policies, procedures, customs and/or practices in place, the County of Los Angeles' law enforcement officers were allowed and permitted to engage in conduct that was in violation of Plaintiffs' constitutional rights as more specifically set out in the General Allegations above.

149.   On information and belief, the Defendant County's failure to adopt such policies and training was the moving force behind the violations of Plaintiff's constitutional rights. Such failures include, but are not limited to:

a.   The County of Los Angeles had no written policy, procedure, custom, practice and/or training regarding the circumstances under which a law enforcement officer must obtain judicial authorization prior to removing a child from the custody of its parent(s) while the child was a patient at a hospital or other similar medical facility;

b.   The County of Los Angeles had no written policy, procedure, custom, practice and/or training requiring a law enforcement officer to obtain judicial authorization prior to removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury at the hands of its parent(s);

c.   The County of Los Angeles had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers delineating the constitutional protections afforded to a parent and child by the First, Fourth, and Fourteenth Amendments;

1        d.     The County of Los Angeles had no written policy, procedure,

2 custom, or practice to require recurrent training of its law enforcement officers to

3 instruct them that they must possess "specific, articulable evidence" that a child

4 would be placed at immediate risk of suffering serious harm at the hands of the

5 parent(s), prior to removing the child from its parent's custody without judicial

6 authorization;

7        e.     The County of Los Angeles had no written policy, procedure,

8 custom, or practice to require recurrent training of its law enforcement officers

9 instructing that a law enforcement officer must pursue reasonable avenues of

10 investigation before removing a child from the custody of its parent(s), when there

11 was no evidence that the child was in immediate risk of suffering serious bodily

12 injury.

13     150.  By deliberately refraining from promulgating any of the

14 aforementioned policies, procedures, customs, practices and/or training, the

15 County permitted the aforementioned basic policy decisions to be made by the

16 lower level law enforcement officers in the field. As a result, the Defendant

17 County of Los Angeles's policy, custom, and/or practice – as established, adopted,

18 and implemented by the Sheriff's Department Defendants – was to detain a child

19 from its parent(s) without judicial authorization, parental consent, and without

20 specific, articulable evidence to suggest that the child is in immediate risk of

21 suffering serious bodily injury at the hands of that parent, and then to continue to

22 detain the child even though they knew there was no legitimate basis to do so; and

23 then to continue to detain the child or otherwise cause the continued detention of

24 the child even thought it was known that there was no factual basis to do so.

25     151.  The state of the law regarding the constitutional protections afforded

26 to a parent and child by the First and Fourteenth Amendments was clearly

27 established well before July 2015. As such, the Defendant County of Los Angeles

28 knew before 2015 that its law enforcement officers required recurrent training on

the constitutional protections afforded to a parent and child. On information and belief, despite this knowledge, the Defendant County of Los Angeles deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its law enforcement officers on the following constitutional protections:

a. The County of Los Angeles did not provide recurrent training to its law enforcement officers regarding the circumstances under which judicial authorization must be obtained prior to removing a child from the custody of its parent(s);

b. The County of Los Angeles did not provide recurrent training to its law enforcement officers regarding the fact that judicial authorization must be obtained prior to removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury;

c. The County of Los Angeles did not provide training to its law enforcement officers on the well established constitutional protections afforded to a parent and child by the First and Fourteenth Amendments.

152. The Defendant County of Los Angeles' deliberate failure to train its law enforcement officers on these established constitutional protections was a substantial factor in causing the Plaintiff's harm, in that officers working for the Defendant County of Los Angeles were unfamiliar with and oblivious to the Plaintiffs' constitutional rights, when the County's sheriff's deputies and/or detectives, seized L.B. and D.B., without judicial authorization, parental consent, and in the absence of exigent circumstances.

153. The Defendant County of Los Angeles's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, *i.e.*, the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

154. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiff harm, in that the L.A. Sheriff's Department and its officers followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of the L.A. Sheriff's Department when they seized L.B. and D.B. from their parents' custody and care without judicial authorization, parental consent, and without specific, reasonable, and articulable evidence to suggest that either child was in immediate risk of suffering serious bodily injury – none of which was constitutionally permissible.

155. Plaintiff is informed and believes that, the Defendant County of Los Angeles never investigates, reprimands, disciplines, and/or discharges its law enforcement officers who engage in the type of conduct alleged herein. Plaintiff is informed and believes that, the County of Los Angeles has refused and continues to refuse to admit that its officers commit a constitutional violation when they engage in the type of conduct alleged herein.

156. These actions, and/or inactions, of County of Los Angeles were the moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

/ / /

/ / /

/ / /

**By PLAINTIFFS RICARDO AND RACHEL BRUNO**

**Against COUNTY OF ORANGE, CHOC CHILDREN'S HOSPITAL OF ORANGE COUNTY, and DOES 1 through 10, inclusive**

157.   Plaintiffs Ricardo Bruno and Rachel Bruno incorporate the above allegations of fact and law as though fully set forth herein.

158.   Defendants, and each of them, had, and have, an affirmative duty and obligation to recognize, acknowledge, and respect the constitutional rights of Plaintiffs, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate their rights. These rights include, without limitation, the right to privacy, family integrity and the right to remain free of non-consensual unwarranted forensic medical examinations all arising under the First and Fourteenth Amendments to the United States Constitution. Moreover, Defendants' employees and/or agents who, in their official capacity had supervisory and/or policy making authority, shared duties identical to those of their respective employers.

159.   The above listed constitutional mandates apply equally to government and to those private persons who are willful or voluntary participants with the government in conducting unwarranted forensic medical examinations. *See, Dennis v. Sparks*, 449 U.S. 24, 27 (1980). As detailed above, Defendant CHOC regularly and systematically perform non-consensual unwarranted invasive forensic medical examinations pursuant to contract, and at the behest and direction of OCSSA. (*See* Exhs. C-D.) Defendant CHOC is paid money by the County of Orange for these forensic medical examinations and regularly cooperates in joint action with government to investigate allegations of child abuse – which is a traditional governmental function. (Exh. D.)

160.   The Defendants, and each of them, also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all its

agents, officers, employees and those acting under them, so as to protect the constitutional rights of Plaintiffs and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

161. Based on the duties charged to the Defendants, and each of them, their policymaking officials knew or should have known of the need to establish such customs, policies, and practices as were required to protect the aforementioned constitutional rights of children with whom the Defendants and their employees and/or agents regularly came into contact.

162. At the time of the underlying events, the regularly established customs and practices of the Defendants, and each of them, that were followed, adhered to, complied with, and carried out by their employees, agents, and contractors, were the moving force that caused the violations of the constitutional rights of Plaintiffs including, but not limited to the following policies, customs, and/or practices:

a. The custom and/or practice of subjecting children to unwarranted non-consensual forensic medical examinations.

b. The custom and/or practice to never notify a parent that an investigatory forensic medical examination will be performed on their child.

c. The custom and/or practice to exclude a parent from the examination room during the forensic medical examination.

d. The custom and/or practice to bar a parent from being in close proximity to the examination room during the forensic medical examination.

e. The custom and practice of never conducting an independent investigation and/or inquiry to determine whether or not there is a

basis for performing an unwarranted and non-consensual forensic investigatory medical examination on a child.

f.    The custom and practice of foregoing any consultation with OCSSA to determine whether a child's forensic medical examination is appropriate and/or necessary.

g.    The custom and practice of performing forensic medical examinations pursuant to contract and at the behest of OCSSA without any determination and/or consideration as to whether the examinations are appropriate and/or necessary.

h.    The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to child abuse investigations.[3]

i.    The custom and/or practice of subjecting children to unwarranted non-consensual forensic vaccinations.

j.    The custom and/or practice to never notify a parent that vaccinations will be performed on their child.

163.    When the Defendants performed D.B.'s forensic medical examination and vaccinations, they were acting pursuant to and in accordance with CHOC's and Orange County's customs, policies, and practices with regard to conducting

---

[3] The above list is not exhaustive. Plaintiffs may seek leave to amend this Complaint as additional information is discovered.

such examinations and vaccinations without first obtaining a warrant under non-emergency circumstances. (Exhs. A-D.)

164.    Defendants, and each of them, never investigate or discipline its employees, doctors, contractors, and/or agents who perform forensic investigatory medical examinations or vaccinations on children – without consent, court order, exigency, and/or inquire to determine whether there was a basis to perform the examinations and/or vaccinations. Defendants, and each of them, did not investigate or discipline the employees, doctors, contractors, and/or agents, for performing forensic investigatory medical examinations and/or vaccinations on children – without consent, court order, exigency, and/or inquire to determine whether there was a basis to perform the examinations.

165.    Defendants, and each of them, refuse to admit that performing a forensic medical examination and/or vaccinations without parental consent, court order, and/or exigent circumstances violates a parent's constitutional rights – and continue to do so. Defendants deny that they violated Plaintiffs' rights when Defendants subjected D.B. to an unwarranted forensic investigatory medical examination without parental consent, court order, and/or exigent circumstances. Defendants ratified and/or approved of D.B.'s non-consensual unwarranted forensic investigatory medical examination.

166.    Defendants, and each of them, failed to train their respective employees and/or agents on the constitutional rights of a parent and child, including but not limited to:

a.    That a child cannot be examined outside the presence of his or her parent(s) –  without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

/ / /

/ / /

b.    That a child cannot be subjected to a forensic investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

c.    That an independent investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual forensic investigatory medical examination on a child.

d.    That a child cannot be subjected to vaccinations – without parental consent, court order, and/or exigent circumstances.

167.   Without adequate training, Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected D.B. to a forensic investigatory medical examination – without parental consent, court order, and/or exigency.

168.   Defendants' non-consensual unwarranted forensic medical examination of D.B. was not an isolated incident specific to his circumstances. On the contrary, such warrantless non-consensual medical examinations are routine, regular and recurring events, and are perpetrated by Defendants on a daily basis in the same or similar circumstances as alleged herein.

169.   Defendants' non-consensual unwarranted vaccinations inflicted on D.B. was not an isolated incident specific to his circumstances. On the contrary, such warrantless non-consensual vaccinations are routine, regular and recurring events, and are perpetrated by Defendants on a daily basis in the same or similar circumstances as alleged herein.

170.   Defendants have engaged in each of the customs and/or practices identified above on an ongoing and continuous basis. (*See* Exhs. A-D.) They continue to engage in said practices on an ongoing and daily basis, and will continue to do so until ordered to stop.

/ / /

171.  These customs, policies, and/or practices of Defendants were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

## JURY DEMAND

Plaintiffs Ricardo Bruno and Rachel Bruno demand a jury trial as to all issues so triable.

## PRAYER

**WHEREFORE**, Ricardo Bruno and Rachel Bruno pray for judgment against Defendants, as to all causes of action, as follows:

1.  General damages and special damages according to proof, but in no event less than $1,000,000;

2.  As against only the individual defendants and CHOC, but not any municipality, punitive damages as allowed by law;

3.  Attorneys fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute;

4.  Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief to be based upon a separate application);

5.  Costs of suit incurred herein; and

6.  Such further relief as the Court deems just and proper.

Dated: August 24, 2017        THE LAW OFFICES OF SHAWN A. MCMILLAN, APC

/s/ Adrian M. Paris, Esq.
Shawn A. McMillan, Esq.
Stephen D. Daner, Esq.
Adrian M. Paris, Esq.
Attorneys for Ricardo Bruno and Rachel Bruno

Exhibit A

Exhibit A

Exhibit A



# Child Abuse Services Team (CAST)

## Medical Component and Forensic Exams

**401 The City Drive**
**Orange CA 92868**
**(714) 935-7545**

**CAST** is a county public-private partnership of Orange County's Social Services Agency, the Health Care Agency, the District Attorney's Office, and the non-profit Orange County Child Abuse prevention center. It was formed to decrease the trauma for abused children and their families by offering a coordinated child-friendly approach to child abuse investigations. CAST conducts forensic interviews and forensic medical examinations, provides expert legal testimony, and supports victims and non-offending family members with mental health crisis intervention services and voluntary child advocacy services.

For more information or to make a referral please go to:

**Child Abuse Services Team (CAST) Orange County**



# About Us

### Giving Children Knowledge, Courage, & Heart

CAST began in 1989 as a multi-disciplinary team program for conducting child sexual abuse investigations at a single site. At that time children who were alleged to have been sexually abused were subjected to multiple interviews by numerous professionals at various different sites. The success of this one-stop approach was expanded to include all forms of child abuse in 1999.



CAST's coordinated on-site services have enabled social services, law enforcement, deputy district attorneys, medical providers, and therapists to collaborate on investigations. Thus, investigations are completed in a more timely, thorough and consistent manner. This benefits both the child and family during the investigation of child abuse.

The child-focused, child-friendly environment at CAST serves to further reduce the trauma for these children. CAST is a place where they can play comfortably and the non-offending parents receive immediate support from experienced staff and volunteers. Community donations of toys, games, stuffed animals, snacks, lunches, and crafts are provided for the comfort of the children. Each year over 1000 children in Orange County are seen at the Child Abuse Services Team office.



Click image to see video



Child Abuse Services Team, a member of the National Children's Alliance, is a nationally recognized leader and role model for its child-friendly approach to conducting child abuse investigations.



# Team Members

| Personnel | Agency |
|-----------|--------|
| Social Workers | Children and Family Services, SSA |
| Deputy District Attorneys | District Attorney's Office |
| Medical Providers | Health Care Agency |
| Child Advocate Coordinators | Orange County Child Abuse Prevention Center |
| Therapists | Health Care Agency |
| Victim Witness Specialists | Community Services Program |
| Child Advocates | Child Abuse Prevention Center |
| Law Enforcement Officers | Police Departments, Probation, O.C. District Attorney |



# Social Workers

The CAST social workers have a number of critical responsibilities regarding protecting children from identified abuse, exploitative and neglectful situations in accordance with state and federal laws. In fulfilling these responsibilities, all reasonable efforts are made to maintain children safely in their own homes, and to remove only those children who cannot be protected. The multidisciplinary team approach allows the CAST team to make difficult case decisions by offering a venue for collaboration between social workers, law enforcement, medical and mental health components. In most cases law enforcement officers make the final decision of whether or not to place children in protective custody.



The social workers assigned to CAST also provide trainings to other CAST components and the general community to improve the understanding of agency mandates, procedures, and the dynamics of child abuse. They serve either as interview specialists or emergency response workers.

## The Interview Specialist

These social workers attend intensive and rigorous training and participate in regular peer review to develop their forensic interview skills. The focus of a CAST interview is to obtain objective information while being sensitive to the child's emotional needs and developmental level. In addition, an Interview Specialist facilitates coordination between law enforcement, social workers, and other team members.

## The Emergency Response Workers

These social workers investigate allegations of child abuse. He/she may elect to conduct the investigation and assessment of the child in the field or bring the child to the CAST site for the interview. A coordinated approach with law enforcement reduces the trauma of multiple interviews for the child. The Emergency Response social worker is responsible for ensuring the safety of the child, while also providing referrals for services to the child and family.



# Medical Providers

A variety of factors such as abuse history, time since abuse occurred, previous medical examinations, past medical treatment experience, family dynamics, developmental level, temperament, etc., all influence the child's perception of the examination. The CAST medical component's goals are to check the child's medical condition, collect forensic specimens, coordinate information with child protective services agencies, and, most importantly, provide reassurance to the child and his/her family. 

## Examiners

The examiners are either doctors or nurse practitioners who are experienced in working with children and testifying in court. In addition, they provide educational programs to the medical community on child abuse evaluations.

## Examination

The CAST examination room is spacious and a concerted effort has been made to make children feel as comfortable as possible. The wall murals and toys give the room a warm feeling. To abate the apprehension of an exam the child is given the opportunity of choosing which advocate (volunteer) will be her/his friend during the exam. In the exam room the colposcope (a binocular instrument similar to binoculars), is demonstrated. The examination is explained to the child in a way that is appropriate to their developmental level. The child dictates the pace of the exam and is allowed as much control as possible. The exam is done with the child positioned in a manner that is least traumatic and minimally uncomfortable. During the exam an advocate plays, reads, sings, finds Waldo etc., with the child. A child is usually given a stuffed animal lion after the exam for "being brave".

## Closure

After the examination, a child and his/her caregiver are told the results of the exam and provided information and emotional support.



# Law Enforcement Officers

Law enforcement is often the first responder to a complaint of child abuse. The case typically begins with a uniformed officer assessing the seriousness of a child's disclosure and immediate safety needs, and providing the proper resources (medical, social services, shelter, etc.) to the child. Once the officer has established the probability of a criminal offense, an investigator is assigned to coordinate the criminal investigation and begin the CAST process.



Key to the success of CAST is open communication with each member of the team and a clear understanding of each team member's function and responsibilities. Law enforcement meets regularly with the rest of the CAST team to exchange information and to explore solutions to problems. The CAST process continues to evolve to meet the needs of the child. It is law enforcement's responsibility to:

Ensure the child's immediate physical, mental health and safety needs.

Conduct criminal investigations, including interviews with victims, witnesses, and suspects.

Coordinate with all members of the CAST team.

File criminal cases with the District Attorney's office and/or petition the juvenile court for jurisdiction.



# Therapists

**The CAST therapists:**



Provide crisis intervention services on-site at CAST

Deliver short-term therapy for the child and family

Facilitate referrals to resources in the community for long term therapy

Two full-time licensed therapists, including one Spanish speaking, are available on-site at CAST to provide crisis intervention services and short-term follow-up therapy. The therapist evaluates the level of mental health services appropriate for each child and family, while providing either direct services or linkage to the services that will best meet their needs.

Short-term therapy is provided at CAST to address post-traumatic stress symptoms and help the child to cope constructively with whatever fears, worries or anxieties may be troubling them in the aftermath of the traumatic experience. The therapists also work with parents to support and educate them about common reactions in the aftermath of trauma. They also help parents understand how to support their child as the child heals from the traumatic experience.



# Referrals

Children are brought to CAST only after a report of suspected maltreatment has been made to a child protective agency. In Orange County, both the Department of Children and Family Services within the Orange County Social Services Agency and law enforcement agencies/police departments are considered child protective agencies.



Orange County Child Protective Services 714-940-1000 or 800-207-4464 (24-hour hotline, 7 days a week). If you would like to discuss or report child abuse.

To report a crime and/or when a child needs immediate protection, call the law enforcement jurisdiction in which the crime has occurred. A local law enforcement agency should be called if the appropriate law enforcement jurisdiction cannot respond in a timely manner.

**Only a child protective agency can make arrangements for children to be brought to the Child Abuse Services Team.**

Exhibit B

Exhibit B

Exhibit B

# Child Advocacy Centers

## California Statewide Directory 2007

Multi-disciplinary Interview Centers/Teams



Child Abuse Training and Technical Assistance Center

# CATTA

working with communities to prevent child abuse

**Child Abuse Training and Technical Assistance Centers (CATTA)**

# 2007 Child Advocacy Centers California Statewide Directory

**Multi-disciplinary Interview Centers Teams**

**California Institute on Human Services, Inc.**
**5880 Commerce Blvd., Suite 207**
**Rohnert Park, CA 94928**
**(707) 284-1300**
**fax: (707) 284-1303**                    **September 2007**

The 2007 Child Advocacy Centers California Statewide Directory update is a publication of the California Institute on Human Services (CIHS), Inc. This directory was produced through the Child Abuse Training and Technical Assistance (CATTA) Center with funding from the Children's Sections of the Governor's Office of Emergency Services (OES), Law Enforcement and Victim Services Division. However, the information expressed herein does not necessarily reflect the position of CIHS, CATTA or OES. No official endorsement should be inferred.

2007, California Institute on Human Services, Inc.
5880 Commerce Boulevard Suite 207, Rohnert Park, CA 94928
(707) 284-1300

# 2007 Child Advocacy Center and/or Multi-disciplinary Interview Team Survey Summary Report

Sixty-seven Child Advocacy Centers (CACs) and Multi-disciplinary Interview Centers/Teams (MDIC/Ts) representing all 58 counties in California were surveyed during March-June of 2007. This survey is conducted to: evaluate CATTA's service in the past year; collect data on current training/technical assistance needs of the centers and teams; and to collect information regarding the current status of the CACs and MDIC/Ts in California, with a focus on their Minimum Standard Protocols.

## Methodology

The following summary is based upon the results from 53 respondents representing 47 counties. The number of centers responding to the survey decreased significantly from the previous year. A brief explanation regarding this decrease is provided on the following page.

If an answer was marked "yes" with a disclaimer that not all the question applied, it was recorded as a "no" answer since it did not contain all the necessary elements.

When a center sent back several versions of the survey, the last one sent was used.

## General CAC/MDIT Information Summary

Of the 53 respondents, 50 currently use the multi-disciplinary approach to interviewing, while 3 have alternative methods for interviewing children who are alleged victims of child abuse. Of the 50 using the multi-disciplinary approach, approximately 70% conduct their interviews at fixed sites, while the remaining have a team that travels to appropriate sites in the area. Nineteen of the respondents reported having stand-alone facilities dedicated to multi-disciplinary interviewing.

## *I. Presence*

*Northern counties reporting an existing Center or Team*
Alameda, Butte, Calaveras, Colusa, Contra Costa, El Dorado (2), Fresno, Glenn, Humboldt, Inyo, Kings, Lake, Lassen, Madera, Marin, Mono, Monterey, Napa, Nevada, Placer, Riverside, Sacramento, San Joaquin, San Mateo, Santa Clara, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Tehama, Trinity, Tulare, Tuolumne, Yolo, Yuba.

*Southern counties reporting an existing Center or Team*
Imperial Kern, Los Angeles (5), San Bernardino, San Diego (2), San Luis Obispo, Santa Barbara, Ventura.

*Counties reporting no current Center or Team*
Alpine, Plumas, Shasta.

*Counties not responding*
There was a large increase in centers not responding to the survey this year. The following counties did not respond: Amador, Del Norte, Mariposa, Mendocino, Merced, Modoc, Orange, San Benito, San Francisco, Santa Cruz, and Sutter. Additionally, four known centers in Los Angeles did not respond: Los Angeles' Center for the Vulnerable Child, Los Angeles' Antelope Valley Center, Los Angeles' Child Abuse and Family Violence Institute at Cal State University, Long Beach and Los Angeles' UCLA Medical Center Child Sexual Abuse Crisis Center.

Among those centers not responding, several have undergone significant changes in leadership over this last year, or experienced a hardship that prevented them from participating in the survey before it was due. Staff

from CATTA and/or the California Network of Child Advocacy Centers have been in contact with these centers over the last few months and have verified that they are functioning, although no data is available at the time of this report.

Several centers who have consistently reported having no center or team did not reply to the survey at all this year, including Amador, Los Angeles' Antelope Valley Center, Mendocino, Modoc, and Santa Cruz.

Repeated attempts to contact Del Norte, San Benito, and Sutter counties were unsuccessful. It is unclear whether centers and/or teams that were once functioning in these counties continue to do so.

Finally, the Los Angeles Center for the Vulnerable Child did not reply to the survey for the fourth year running, although it is generally accepted by those in Los Angeles County and throughout the state that they continue to conduct child forensic interviews.

## II. Length of Service: (n=50)
Since this variable is relatively static, any variation in the results from last year is likely due to a different respondent pool.

| Year Established | # of respondents |
|------------------|------------------|
| 2000-2006        | 16               |
| 1990-1999        | 29               |
| 1980-1989        | 3                |
| 1970-1979        | 2                |

According to the self-reports, the earliest urban centers were in San Diego and Los Angeles. The earliest centers in rural and combination counties, again self-reported, were Butte and San Joaquin. There were growth spurts in 1996 (5 centers), in 1998 (5 centers), and in 2000 (5 centers).

## III. Number of Children Served Annually: (n=50)

| # of Children | Rural Ctrs | Comb. Ctrs | Urban Ctrs | Total |
|---------------|------------|------------|------------|-------|
| 1-99          | 18         | 0          | 1          | 19    |
| 100-399       | 3          | 11         | 8          | 22    |
| 400-999       | 0          | 4          | 3          | 7     |
| 1000+         | 0          | 1          | 1          | 2     |

## IV. Types of Cases Handled by Center or Team: (n=50)
These responses were roughly consistent with the data received last year.

| Case type | # of respondents |
|-----------|------------------|
| Sexual Assault | 50 |
| Felony | 48 |
| Misdemeanor | 48 |
| Physical Assault | 45 |
| Developmentally-Delayed Clients | 39 |
| Witness to Domestic Violence | 37 |
| Drug Endangered Children | 17 |
| Elder Abuse | 24 |
| Juvenile Offenders | 16 |



Legend:
- Sexual Assault
- Felony
- Misdemeanor
- Physical Assault
- Developmentally-Delay Clients
- Witness to Domestic Violence
- Drug Endangered Children
- Elder Abuse

# of respondents

**V. Team Composition: (n=49)**

| Participating agencies | # of respondents reporting |
|---|---|
| Child Protective Services | 50 |
| Law Enforcement | 50 |
| Prosecution | 49 |
| Advocacy | 47 |
| Medical | 42 |
| Other | 24 |



# of respondents reporting

Legend:
- Child Protective Services
- Law Enforcement
- Prosecution
- Advocacy
- Medical
- Other

**VI. Number of interviewers (n=45)**

| # of interviewers | # of respondents reporting |
|---|---|
| 1 to 1.5 FTE | 8 |
| 2-3 | 18 |
| 4-8 | 19 |

### VII. Qualifications of interviewers (n=49)

| Qualifications | # of respondents reporting |
|---|---|
| CFIT Training | 38 |
| Interviewing training other than CFIT | 8 |
| Law Enforcement or Child Protective | 17 |
| Services Field Experience | |
| Training in addition to CFIT | 4 |
| Master's degree (or Master's pref) | 12 |

### VIII. Interviewing in Other Languages: (n=50)

Forty-two centers reported doing interviews in languages other than English. Thirty-six reported having bilingual interviewers. Thirty-nine reported using an interpreter; of these, eleven required that the interpreter be court-certified. Forty respondents reported interviewing in Spanish. Other languages listed included ASL, Farsi, Hmong, Korean, Tagalog, and Vietnamese. Additionally, eight respondents stated that the center was willing to accommodate any language for which a qualified interpreter could be found.

### Conclusion:

Based on the data from this survey, a hypothetical typical CAC in California looks like this (data used is any variable representing over 50% of the responses for the question, or if none reached 50%, the highest rated response for the category is included):

The typical MDIC in California was established in the 1990s. It serves 100-399 children annually. It accepts sexual assault, physical assault, and witness to domestic violence felony or misdemeanor cases. It accepts developmentally delayed clients. Its team is made up of CPS, law enforcement, prosecution, medical personnel, and advocacy personnel. It has 4-8 interviewers and requires them to have CFIT training. It accommodates Spanish-speaking clients with a bilingual interviewer or by using an interpreter.

It has a protocol containing agreements for participation from the District Attorney, Law Enforcement, CPS or equivalent, Public Health and/or Medical Examiners, Victim Witness, and Mental Health. The protocol contains written standards and procedures, a mission goal and mission statement, recognition of the need for ongoing training procedures, a procedure for periodic review by agencies involved, and a procedure for dissemination of information to all parties involved. It addresses a variety of situations explicitly, including intra-family or in-home abuse, out-of-home abuse, perpetration by stranger, siblings of a child abuse victim, and homes with domestic violence.

In regards to a sequence of responses, the typical CAC protocol addresses coordination among first responders, procedures for sharing of information, investigative procedures, reporting and cross-reporting procedures, and minimum standard levels of professional competency.

It addresses the location of the interview or exam, qualifications of the child for an examination or interview, procedures for documentation, qualifications of personnel, and guidelines for determining which agency budget will cover the cost.

It addresses procedures for obtaining consent for medical exams and forensic interviews and procedures for emergency situations or professional judgment that allow for deviation from the protocol.

2007 showed a decrease in the amount of survey's returned. Other than a few specific cases (already indicated), most of the survey's not returned are from counties that continue to struggle with establishing and maintaining their teams. A focused effort on team building in cooperation with the State Coordinator and the California Network of Child Advocacy Centers could provide the support needed for these teams to make their first steps in setting up a Multidisciplinary model in their communities, and/or provide the help they need in maintaining these teams once they are established.

<u>CONTACT</u>   **Jyothi Atluri**
Child Abuse Services Team (CAST)
1337 Braden Court
Orange, CA 92868

☒ Urban  ☐ Rural  ☐ Combination
Phone: 714  940-4700
Fax:    714  940-4702
Email:

## GENERAL INFORMATION

| | |
|---|---|
| Operational Since: | 1989 |
| Age range: | 3-18 |
| Approx. No. of Children a Yr: | 900 |
| Area served: | Orange County |

## TEAM COMPOSITION

| | | |
|---|---|---|
| Child Protective Services: | ☒ Yes  ☐ No  \|  No answer | Medical: ☒ Yes  ☐ No  \|  No answer |
| Law Enforcement: | ☒ Yes  ☐ No  \|  No answer | Advocacy: ☒ Yes  ☐ No  \|  No answer |
| Prosecution: | ☒ Yes  ☐ No  \|  No answer | Other: ☒ Yes  ☐ No  \|  No answer |

## TYPES OF CASES

| | | |
|---|---|---|
| ☒ Felony | ☒ Physical Assault | ☒ Witness to Domestic Violence |
| ☐ Elder Abuse | ☒ Developmentally-delayed Clients | ☒ Previous Disclosure Required |
| ☒ Misdemeanor | ☒ Sexual Assault | |

## INTERVIEW PROCESS

| | |
|---|---|
| Number of interviewers: | 4 |
| Interviewers come from the following agencies: | Social Services Agency |
| Special qualifications or training for interviewers: | Social workers with field experience; Child Forensic Interview training; CATTA trainings; National Academy trainings; internal training, supervision and peer review; conferences |
| Provide interviews in languages other than English: | Primarily Spanish. However, resources are available for most languages. |

| | |
|---|---|
| Bilingual interviewers: | ☒ Yes  ☐ No  \|  No answer |
| Interpreters: | ☒ Yes  ☐ No  \|  No answer |
| Interpreters court-certified: | ☐ Yes  ☒ No  \|  No answer |

## MISSION STATEMENT

Reduce trauma to children.

## FACILITY INFORMATION

Stand alone

| | | | |
|---|---|---|---|
| Sq Feet: | 7000 | Rooms: | 2 |

Share facility with Social Services.

Exhibit C

Exhibit C

Exhibit C

**CERTIFIED COPY**

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

RAELYN STOKES, an individual,   )
MARCUS STOKES, an individual;   )
T.S., a minor, by and through   )
her guardian ad litem;          )
                                )
            Plaintiffs,         )
                                )        Case No.
            v.                  )  30-2010 003561398
                                )
COUNTY OF ORANGE, et al.,       )     (Volume I)
                                )    (Pgs. 1 - 284)
            Defendants.         )
_____)

Deposition of:    DAPHNE WONG, M.D.    (Volume I)


Date and time:    Monday, August 20, 2012, 10:12 a.m.


Location:         17822 17th Street, Suite 205
                  Tustin, California


Reporter:

Patricia Tornell, CSR, RPR
Certificate No. 2974

www.tornellandcotten.com
e-mail: depos@tornellandcotten.com

**TORNELL & COTTEN**
PROFESSIONAL COURT REPORTERS
1401 N. TUSTIN AVE., STE. 160
SANTA ANA, CA 92705
(714) 543-1600
FAX (714) 543-1614

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

RAELYN STOKES, an individual,  )
MARCUS STOKES, an individual;  )
T.S., a minor, by and through  )
her guardian ad litem;         )
                               )
                  Plaintiffs,  )
                               )       Case No.
                  v.           )  30-2010 003561398
                               )
COUNTY OF ORANGE, et al.,      )      (Volume I)
                               )    (Pgs. 1 - 284)
                  Defendants.  )
_____  )


Deposition of:    DAPHNE WONG, M.D.    (Volume I)


Date and time:    Monday, August 20, 2012, 10:12 a.m.


Location:         17822 17th Street, Suite 205
                  Tustin, California


Reporter:

Patricia Tornell, CSR, RPR
Certificate No. 2974

```
1          Volume I of the deposition of DAPHNE WONG,

2     M.D., taken before Patricia Tornell, Certified

3     Shorthand Reporter, Certificate No. 2974, commencing

4     at 10:12 a.m. on Monday, August 20, 2012, at the Law

5     Offices of Madory, Zell Pleiss & McGrath, 17822 17th

6     Street, Suite 205, Tustin, California.

7

8

9

10    APPEARANCES OF COUNSEL:

11

12        For the Plaintiffs:

13            THE LAW OFFICES OF SHAWN A. McMILLAN, APC
              BY:  SHAWN A. McMILLAN, ESQ.
14            4955 Via Lapiz
              San Diego, California  92122
15            (858) 646-0069

16

17        For Defendants COUNTY OF ORANGE, a public entity,
          COUNTY OF ORANGE erroneously sued herein as
18        ORANGE COUNTY DEPARTMENT OF CHILDREN AND FAMILY
          SERVICES, SUNDAY PETRIE, JAMES WALDRON, INGRID
19        HARITA, SUSAN AZADI, OSCAR R. AGUIRRE, JAKE
          MICHEL, and SUSAN HORN, as employees of COUNTY OF
20        ORANGE, a public entity:

21
              WOODRUFF, SPRADLIN & SMART
22            BY:  PATRICK A. DESMOND, ESQ.
            - 555 Anton Boulevard, Suite 1200
23            Costa Mesa, California  92626
              (714) 558-7000

24

25
```

APPEARANCES OF COUNSEL (Continued):


     For the Witness DAPHNE WONG, M.D.

          MADORY, ZELL, PLEISS & McGRATH
          BY:  MARK G. McGRATH, ESQ.
          17822 17th Street, Suite 205
          Tustin, California  92780
          (714) 832-3772


ALSO PRESENT:

          PAULA QUINN, CHOC

DAPHNE WONG, M.D.,

called as a witness and having

been first duly sworn by the

Certified Shorthand reporter, was

examined and testified as follows:


EXAMINATION

BY MR. DESMOND:

    Q   Can you please state and spell your name for the record.

    A   It's Daphne Wong, D-a-p-h-n-e W-o-n-g.

    Q   Dr. Wong, have you ever had your deposition taken before?

    A   One time.

    Q   How long ago was that?

    A   How long ago was that?  A month or two ago.

    MR. McGRATH:  A few weeks ago.

    THE WITNESS:  A few weeks ago.

    MR. McMILLAN:  Was that the Koertgen matter?

    THE WITNESS:  Yes.

///

| | |
|---|---|
| 1 | very difficult for her to take down your testimony. |
| 2 | Okay? |
| 3 | A   Yes. |
| 4 | Q   Where are you currently employed? |
| 5 | A   Children's Hospital of Orange County. |
| 6 | Q   How long have you been with Children's |
| 7 | Hospital of Orange County? |
| 8 | A   Since 2002. |
| 9 | Q   And what is your title at Children's Hospital |
| 10 | of Orange County? |
| 11 | A   I am the assistant director to the pediatric |
| 12 | residency program and the director of the -- medical |
| 13 | director of the child abuse team. |
| 14 | Q   I want to back up a little bit and talk about |
| 15 | the period of time prior to your employment. |
| 16 | Can you outline for me your educational |
| 17 | background, please? |
| 18 | A   Yes. |
| 19 | I went to medical school at the University of |
| 20 | Utah. |
| 21 | Did my internship and residency at UCLA |
| 22 | Medical Center. |
| 23 | And then was employed at UCLA until coming |
| 24 | down to CHOC. |
| 25 | Q   What year did you graduate from medical |

BY MR. DESMOND:

    Q    Anything else?

    A    I go to peer review discussions.

    Q    Anything else in the way of classes or conferences related to the detection of child abuse that you would have attended prior to February 23rd, 2009, that we haven't already talked about?

    A    No.

    Q    Okay.  What year did you first start at CHOC?

    A    2002.

    Q    What was your title when you started at CHOC?

    A    I was the assistant director to the pediatric residency program and part of the SCAN team, child abuse team, at CHOC.

    Q    And what is the SCAN team?

    A    It's Suspected Child Abuse and Neglect team.

    Q    When you first were hired at CHOC, as one of your duties as a member of the SCAN team did you have to produce any credentials or show CHOC how it is you had qualified to work on the SCAN team?

    A    During my interview we discussed that, and -- yeah, and my qualifications from UCLA.

    Q    Part of it was based on the years that you

1    had worked at UCLA doing the same type of work,

2    namely, detecting child abuse; correct?

3         A    That's correct.

4         Q    How many years prior to working at CHOC had

5    you worked at UCLA in the capacity of a doctor that

6    helps detect child abuse?

7         A    Four years.

8         MR. McMILLAN:  How many years?  Sorry?

9         THE WITNESS:  Four years.

10   BY MR. DESMOND:

11        Q    What were your duties back in 2002 as a

12   member of the SCAN team?

13        A    If there were consults where there's the

14   attending physician and the primary team had concerns

15   about a possible or suspicion of child abuse and they

16   wanted a consult, they would contact me and ask me to

17   consult on a child.

18        Q    Back in 2002, other than you was there any

19   other doctors at CHOC that served the same capacity,

20   namely, helping detect child abuse?

21        A    The director of the child abuse team at the

22   time was Dr. Tupas, and she also did.

23        Q    Was there anybody else?

24        A    No.  I believe that people just kind of did

25   their own.

1      Q   Well, let me just ask you this then.

2      You've been the medical director of the SCAN

3  team at CHOC since 2006; right?

4      A   That's correct.

5      Q   And you're an employee of CHOC in that

6  capacity; correct?

7      A   Yes, I am.

8      Q   As an employee of CHOC in the capacity as the

9  medical director of its SCAN team since 2006, how many

10  times have you consulted on cases where Orange County

11  Social Services Agency was involved.

12      A rough estimate is fine.

13    MR. McGRATH:  Do you have an estimate?

14    THE WITNESS:  No.

15  BY MR. McMILLAN:

16      Q   Is it thousands?

17      A   No.  Probably hundreds.

18      Q   Hundreds?  Okay.  High hundreds?  Seven,

19  eight hundred?

20      A   I have no idea.

21      Q   It's a lot, though, isn't it?

22    MR. DESMOND:  It's vague and ambiguous.

23    MR. McGRATH:  You could stipulate too many.

24    MR. McMILLAN:  Well, obviously, too many.  At

25  least one too many.

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER


The undersigned Certified Shorthand Reporter, licensed in the State of California, does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true copy of my shorthand notes thereof;

That the dismantling of the original transcript will void the reporter's certificate.

I further declare that I have no interest in the outcome of the action.

In witness whereof, I have subscribed my name this date: _____ AUG 23 2012 _____ .


Certificate Number 2974

Exhibit D

Exhibit D

Exhibit D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AGREEMENT

BETWEEN

COUNTY OF ORANGE

AND

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

AS DESCRIBED IN ARTICLE IX, SECTION 9, OF THE CALIFORNIA CONSTITUTION,

ON BEHALF OF UNIVERSITY OF CALIFORNIA, IRVINE, SCHOOL OF MEDICINE,

DEPARTMENT OF PEDIATRICS

FOR THE PROVISION OF THE CHILD ABUSE MEDICAL SERVICES PROVIDER


THIS AGREEMENT, entered into as of this 1st day of January, 2017, is by and between the COUNTY OF ORANGE, hereinafter referred to as "COUNTY," and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation described in California Constitution Article IX, Section 9, on behalf of UNIVERSITY OF CALIFORNIA, IRVINE, SCHOOL OF MEDICINE, DEPARTMENT OF PEDIATRICS ("UCI" or "CONTRACTOR"). This Agreement shall be administered by the County of Orange Social Services Agency Director or designee, hereinafter referred to as "ADMINISTRATOR."


W I T N E S S E T H:


WHEREAS, COUNTY desires to contract with CONTRACTOR for the provision of the Child Abuse Medical Services Provider; and

WHEREAS, CONTRACTOR agrees to render such services on the terms and conditions hereinafter set forth;

WHEREAS, such services are authorized and provided for pursuant to California Welfare and Institutions Code Section 18961.7, California Civil Code section 56.10 et seq. and 45 CFR 164.512;

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

Requirements for Federal Awards; Title 48 CFR Section 31.2; and all applicable laws and regulations of the United States, State of California, County of Orange Social Services Agency and all administrative regulations, rules and policies adopted thereunder as each and all may now exist or be hereafter amended.

5.2.1 For Federally funded Agreements in the amount of $25,000 or more, CONTRACTOR certifies that its officers and/or principals are not debarred or suspended from Federal financial assistance programs and/or activities.

6. DELEGATION AND ASSIGNMENT/SUBCONTRACTS

6.1 Delegation and Assignment:

In the performance of this Agreement, CONTRACTOR may neither delegate its duties or obligations nor assign its rights, either in whole or in part, without the prior written consent of COUNTY. Any attempted delegation or assignment without prior written consent shall be void. The transfer of assets in excess of ten percent (10%) of the total assets of CONTRACTOR and any change in the corporate structure, the governing body, or the management of CONTRACTOR which occurs as a result of such transfer shall be deemed an assignment of benefits under the terms of this Agreement requiring COUNTY approval.

6.2 Subcontracts:

CONTRACTOR shall not subcontract for services under this Agreement without the prior written consent of ADMINISTRATOR. If ADMINISTRATOR consents in writing to a subcontract, in no event shall the subcontract alter, in any way, any legal responsibility of CONTRACTOR to COUNTY. All subcontracts must be in writing and copies of same shall be provided to ADMINISTRATOR.

CONTRACTOR shall obtain preapproval from ADMINISTRATOR before entering into a subcontract with any organization during the term of this

Agreement. CONTRACTOR's proposed subcontract agreement shall take into consideration such factors as: pricing policies and techniques; experience and quality of service; methods of evaluating subcontractor responsibility; relationship of subcontractor to CONTRACTOR; and planning and management of subcontract, including internal audit procedures and monitoring of subcontractor's performance until completion of service.

CONTRACTOR and its subcontractor(s) shall establish and maintain accurate and complete financial records related to services provided under the terms of this Agreement. Such records may be subject to the satisfaction of ADMINISTRATOR, and to the examination and audit by ADMINISTRATOR or designee, for a period of five (5) years, or until any pending audit is completed.

6.3 <u>Consent to Subcontract</u>:

ADMINISTRATOR hereby consents to CONTRACTOR's subcontracting to Children's Hospital of Orange County ("CHOC"), a California non-profit corporation, those services identified in Exhibit "A" annexed hereto for provision by CHOC.

7. <u>FORM OF BUSINESS ORGANIZATION AND REAL PROPERTY DISCLOSURE</u>

7.1 <u>Form of Business Organization</u>:

Upon the request of ADMINISTRATOR, CONTRACTOR shall prepare and submit, within thirty (30) days thereafter, an affidavit executed by persons satisfactory to ADMINISTRATOR containing, but not limited to, the following information:

7.1.1 The form of CONTRACTOR's business organization, i.e., proprietorship, partnership, corporation, etc.

7.1.2 A detailed statement indicating the relationship of CONTRACTOR, by way of ownership or otherwise, to any parent organization or individual.

7.1.3 A detailed statement indicating the relationship of

WHEREFORE, the parties hereto have executed this Agreement in the County of Orange, California.

By: _Teresa Conk_

TERESA CONK
CHIEF STRATEGY OFFICER AND
ASSOCIATE VICE CHANCELLOR, UCI HEALTH
THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA, AS DESCRIBED
IN ARTICLE IX, OF SECTION 9, OF THE
CALIFORNIA CONSTITUTION, ON BEHALF OF
UNIVERSITY OF CALIFORNIA, IRVINE
SCHOOL OF MEDICINE
DEPARTMENT OF PEDIATRICS

Dated: 11/14/16

By: _____

CHAIRWOMAN
OF THE BOARD OF SUPERVISORS
COUNTY OF ORANGE, CALIFORNIA

Dated: _____

SIGNED AND CERTIFIED THAT A COPY OF THIS
DOCUMENT HAS BEEN DELIVERED TO THE CHAIR
OF THE BOARD PER G.C. SEC. 25103, RESO 79-1535
ATTEST:

_____
ROBIN STIELER
Clerk of the Board of Supervisors
Orange County, California

APPROVED AS TO FORM
COUNTY COUNSEL
COUNTY OF ORANGE, CALIFORNIA

By: _annetoo_

DEPUTY

Dated: 11/10/16

(CCB3216)          42 of 42          (11/09/16)

EXHIBIT A

TO

AGREEMENT

BETWEEN

COUNTY OF ORANGE

AND

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

AS DESCRIBED IN ARTICLE IX, SECTION 9, OF THE CALIFORNIA CONSTITUTION,

ON BEHALF OF UNIVERSITY OF CALIFORNIA, IRVINE, SCHOOL OF MEDICINE,

DEPARTMENT OF PEDIATRICS

FOR THE PROVISION OF THE CHILD ABUSE MEDICAL SERVICES PROVIDER

1. POPULATION TO BE SERVED

1.1 CONTRACTOR shall provide services to children birth (0) to eighteen (18) years with abuse or neglect issues who have been referred by Social Services Agency (SSA)/Children and Family Services (CFS), medical providers, law enforcement or Juvenile Court.

1.2 CONTRACTOR shall also provide services to developmentally delayed and/or disabled adults eighteen (18) years and older, who cannot be adequately served by adult programs due to their special needs, and have been referred by law enforcement or Adult Protective Services (APS).

1.3 Children and adults to be served by CONTRACTOR shall hereinafter be referred to as "PATIENTS."

2. SERVICES PROVIDED BY LOCATION

As detailed below, CONTRACTOR will provide forensic medical examinations, physical abuse and neglect assessments, referrals to on-site subspecialists and extensive diagnostic and treatment services for PATIENTS who require evaluation of or treatment for abuse or neglect.

## 2.1 Child Abuse Services Team (CAST) Medical Facility

The CAST site was established in 1989 as a multidisciplinary program that enables social services, law enforcement, deputy district attorneys, medical providers and therapists to collaborate on child abuse investigations. Medical evaluations at the CAST site are most appropriate when the investigations involve felony child abuse and are intended specifically to support child sexual abuse evaluations.

CONTRACTOR shall deliver the following services in a manner that is culturally sensitive and linguistically appropriate to meet the primary language needs of those served. Services provided at this location shall include, but are not limited to:

### 2.1.1 Medical Services:

2.1.1.1    Coordination of all medical examinations and consultations required at the CAST Medical Facility (onsite or offsite);

2.1.1.2    Onsite abuse or neglect medical, forensic and appropriate follow-up examinations;

2.1.1.3    Physician oversight, supervision and training of medical staff;

2.1.1.4    Proper    documentation    of    services    and activities in a manner that allows information to be effectively and accurately retrieved and presented to the Court, collaborators or the community;

2.1.1.5    Ensure medical records of child maltreatment cases are made available to ADMINISTRATOR.

2.1.1.6    Ensure secure chain of custody of records and potential evidence;

2.1.1.7    Expert testimony in criminal and juvenile court proceedings;

2.1.3.2     Medical students and residents;

2.1.3.3     CAST Team participants such as law enforcement officers, SSA social workers, volunteer advocates, deputy district attorneys, victim witness and therapists;

2.1.3.4     Mandated reporters, civic organizations and the general public; and

2.1.3.5     Educational institutions, colleges, universities, workshops and conferences.

2.2     Physical Abuse and Neglect Diagnosis and Assessment (PANDA) Clinic

The PANDA Clinic will assess injuries that may be a result of child abuse that are not appropriate for the CAST Medical Facility. The PANDA Clinic will provide extensive services, medical tests and referrals to pediatric subspecialists not available at the CAST site.

CONTRACTOR, through its subcontractor CHOC, shall deliver the following services in a manner that is culturally sensitive and linguistically appropriate to meet the primary language needs of those served. Services provided at this location shall include but are not limited to:

2.2.1     Medical Services:

2.2.1.1     Coordination of all medical examinations and consultations required at the PANDA Clinic (onsite or offsite);

2.2.1.2     Onsite abuse or neglect medical, forensic and appropriate follow-up examinations;

2.2.1.3     Patient referral for diagnostic testing and subspecialists, as needed;

2.2.1.4     Physician oversight, supervision and training of medical staff;

2.2.1.5     Proper documentation of services and activities in a manner that allows information to be effectively and

accordance with services provided under this Agreement.

5.    ADDITIONAL CONTRACTOR RESPONSIBILITIES

In addition to providing the services described in Paragraph 2 of this Exhibit A, CONTRACTOR agrees to:

5.1    Participate in and support the establishment of a group to guide expansion and enhancement efforts and related services that may include, but are not limited to development of protocols, peer review processes, child protection team meeting structures, training and educational material.

5.2    Participate in child protection team meetings consisting of representatives from SSA, medical services, the District Attorney's Office, law enforcement agencies, behavioral health personnel and community agencies to review and coordinate critical cases.

5.3    Participate in countywide child abuse prevention efforts, including the Suspected Child Abuse and Neglect Teams, Child Abuse and Injury Prevention Committee, Orange County Child Death Review Team and Working to End Child Abuse and Neglect Coalition.

5.4    Participate in CAST Program case review meetings and monthly staff meetings.

5.5    Participate in CAST Policy Board meetings, which are comprised of County of Orange Agency Directors and other representatives from sponsoring agencies, and are used to address policy issues that impact upon the Program.

6.    ADMINISTRATOR RESPONSIBILITIES

ADMINISTRATOR will:

6.1    Provide office space, office furniture and office equipment at the CAST Facility for medical staff assigned to this program.   The precise location, size and type of said office space, office furniture and office equipment will be determined by ADMINISTRATOR.

6.2    Allow sufficient space and access to resources in order to support

1 to make modifications to Minimum Staffing Education and Experience
2 Requirements as it deems to be in the best interest of COUNTY. The
3 CONTRACTOR, through its subcontractor CHOC, shall provide the following
4 described staff positions:

5         13.2.1   Physician
6                 Duties:
7                 13.2.1.1   Perform forensic abuse or neglect medical
8 examinations;

9                 13.2.1.2   Provide consultation to ADMINISTRATOR or its
10 designees, law enforcement, County Counsel, District Attorney, and Sheriff-
11 Coroner staff on reported abuse or neglect cases, which may include, but is
12 not limited to, review of medical records and photographs, evaluation of
13 diagnostic tests, discussion of information with assigned social workers and
14 caregivers, conferences with medical staff and collaborator agencies, make
15 recommendations for further action and render medical opinions;

16                 13.2.1.3   Provide consultation to legal team involved
17 in criminal and juvenile court proceedings;

18                 13.2.1.4   Give expert testimony, which may include, but
19 is not limited to, testimony in criminal and juvenile court proceedings as
20 mandated by subpoena;

21                 13.2.1.5   Educate and train residents or medical
22 students, and/or students of nurse or nurse practitioner programs at the
23 agreed upon location; and

24                 13.2.1.6   Educate social workers, nurses and/or SSA
25 staff at the discretion of the ADMINISTRATOR.

26                 Qualifications:
27                 13.2.1.7   Board certified/eligible Child Abuse
28 Pediatrician, in good standing.

*R*ICARDO *B*RUNO, ET AL., VS. *C*OUNTY OF *L*OS *A*NGELES, ET AL.,
CASE NO. 8:17-cv-01301-CJC-JDE
*U*NITED *S*TATES *D*ISTRICT *C*OURT, *C*ENTRAL *D*ISTRICT OF *C*ALIFORNIA,
*S*OUTHERN *D*IVISION - *S*ANTA *A*NA

I am employed in the County of San Diego, State of California. I am over 18 years of age and am not a party to the within action. My business address is 4955 Via Lapiz, San Diego, California 92122.

On August 24, 2017, I electronically filed the foregoing documents described as:

• **FIRST AMENDED COMPLAINT FOR DAMAGES**

 **X** **(BY ELECTRONIC FILING)** I electronically filed with the Clerk of the Court a true and correct copy of the original as indicated above, and a Notice of Electronic Filing (NEF) is automatically generated by the CM/ECF system and sent by e-mail to all attorneys in the case. In addition, pdf courtesy copy of the filing was sent via email to the parties counsel. As listed on Attachment A. In addition, a courtesy copy of the filing was sent to the Court at its address 411 West Fourth Street, Room 1053, Santa Ana, CA 92701-4516.

And I hereby certify that I have mailed the foregoing documents as indicated above to the parties who are not registered for the CM/ECF system as following:

**None**.

Parties can access this filing through the Court's system.

Dated: August 24, 2017

 _/S/ Adrian M. Paris_
 Adrian M. Paris

/ / /

/ / /

/ / /

/ / /

/ / /

| | |
|---|---|
| Larry Pleiss, Esq.<br>lpleiss@pcsrlaw.com<br>Candice P. Hallack, Esq.<br>Pleiss Casey Sitar & Ross<br>5510 Trabuco Rd.<br>Irvine, CA 92620-5705<br>Telephone: (949) 788-1790<br>Facsimile: (949) 788-1799 | Attorneys for Defendant CHOC Children's Hospital of Orange County |
| Daniel K. Spradlin. Esq.<br>dspradlin@wss-law.com<br>Roberta A. Kraus, Esq.<br>Jeanne L. Tollison, Esq.<br>WOODRUFF SPRADLIN & SMART<br>555 Anton Blvd #1200<br>Costa Mesa, CA 92626<br>Telephone: (714) 558-7000<br>Facsimile: (714) 835-7787 | Attorneys for Defendants County of Orange, Laura Todd, and Nicole Strattman |
| Tomas A. Guterres, Esq.<br>tguterres@ccmslaw.com<br>Christie Bodnar Swiss, Esq.<br>cswiss@ccmslaw.com<br>COLLINS COLLINS MUIR + STEWART LLP<br>1100 El Centro Street<br>South Pasadena, CA 91030<br>Telephone: (626) 243-1100<br>Facsimile: (626) 243-1111 | Attorneys for Defendant County of Los Angeles, Deputy Jason Schmoker, and Detective Maricruz Perez |